Dee Bredin Thibault v. Commissioner. Conrad Thibault and Dee Bredin Thibault v. Commissioner.
Thibault v. Commissioner
Docket Nos. 84402, 84403.
United States Tax Court
T.C. Memo 1963-64; 1963 Tax Ct. Memo LEXIS 278; 22 T.C.M. (CCH) 251; T.C.M. (RIA) 63064; March 5, 1963
*278 John A. Sullivan, Esq., 14 Wall St., New York, N. Y., for the petitioners. Lee A. Kamp, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in additions to petitioners' income tax as follows: Addition to Tax
Sec. 294(d)(1)(B)
Year
Petitioners
I.R.C. 1939
1951
Dee Bredin Thibault
$3,575.00
1952
Dee Bredin Thibault
3,600.00
1953
Conrad and Dee Bredin Thi-
bault
3,112.50
1954
Conrad and Dee Bredin Thi-
bault
3,650.00
The issue presented is whether petitioners' failure to make timely installment payments of estimated tax for 1951 through 1954 was due to reasonable cause and not willful neglect. Findings of Fact Some of the facts have been stipulated. They and the facts shown by the exhibits attached thereto are found accordingly. Petitioners, Conrad Thibault and Dee Bredin Thibault, husband and wife, were married in December 1953 and reside at 1035 Fifth Avenue, New York, New York. Dee Bredin Thibault filed individual income tax returns for calendar years 1951 and 1952 and petitioners filed joint income tax returns for calendar years 1953 and *279 1954 with the district director of internal revenue, Upper Manhattan district, New York, New York. Dee Bredin Thibault will hereinafter be referred to as petitioner. For 1951, petitioner duly filed a declaration of estimated tax of $50,000 and an amended declaration of $40,000. The following installments were paid: March 15, 1951
$2,500
June 15, 1951
2,500
September 15, 1951
5,000
January 10, 1952
2,000
For 1952, petitioner filed a declaration of estimated tax of $40,000. No estimated tax payments were made. For 1953, petitioner filed a declaration of estimated tax of $35,000 on which no payments were made. Petitioner Conrad Thibault filed a separate declaration indicating estimated income tax of $1,000 and paid that amount. For 1954, petitioner and her husband filed a declaration of estimated tax of $30,000 and an amended declaration of $42,500. No installment payments were made. The predominant source of the income to which the additions to tax here relate is petitioner's life interest in a spendthrift trust composed of General Motors stock. Dividends in the following amounts were paid to petitioner: 1951
$80,000.00
1952
80,000.00
1953
80,000.00
1954
99,958.60
*280 Petitioner had insignificant amounts of other income. From 1939 to 1950, including years during World War II when she was stationed in Great Britain and the Pacific in the service of the United States Government, petitioner retained Joseph B. Deutsch (hereinafter referred to as Deutsch) to handle her income tax. Deutsch is a Certified Public Accountant and former agent of the internal revenue service who is a qualified tax consultant. Deutsch's practice was to prepare returns and estimates from information supplied by petitioner and submit them to petitioner for signing and mailing. Deutsch prepared declarations of estimated tax for petitioner through 1947 which were duly filed. Declarations for 1948, 1949, and 1950 were not timely filed nor were timely payments made thereon. The following actions by Deutsch occurred in regard to petitioner's estimated tax for 1948, 1949, and 1950: (a) A letter to petitioner dated February 20, 1948, enclosing an income tax return for 1947 which he had prepared, in which he stated that, "I will defer filing your 1948 Declaration of Estimated Tax in order to conserve your cash, as you have until [January 15, 1949] to file the same without a *281 penalty." (b) A telephone conversation with petitioner's secretary on June 15, 1948, in which he advised payment of the estimated tax. (c) A letter to petitioner dated August 19, 1948, advising her to file her declaration for 1948. (d) A telephone conversation with petitioner's secretary on September 17, 1948, advising her that the declaration must be filed no later than January 15, 1949. (e) A visit on December 9, 1948, either with petitioner or her secretary in regard to filing the declaration. (f) A telephone conversation on January 4, 1949, advising petitioner to file her 1948 estimate. Petitioner told Deutsch that she had no money and he advised her to file a final return and ask for an extension of time to pay. (g) A telephone message from petitioner on January 31, 1949 that she was unable to pay the 1948 tax. (h) A telephone conversation on August 16, 1949, with petitioner's secretary explaining interest charges on extensions of time to pay. (i) A letter to petitioner on January 3, 1950, noting that no declaration for 1949 had been filed, "[the] reason, of course, being that you were short of funds." Deutsch advised her that the last opportunity for filing *282 expired on January 15, 1950 and that, "[in] order to avoid penalties, the tax payment on the declaration should be at least 80% correct * * *." He asked for information regarding the amount of her net taxable income for 1949. (j) A telephone conversation on January 6, 1950, with petitioner, during which she stated that she had no cash and did not wish to file a declaration. (k) A letter to petitioner dated March 4, 1950, enclosing an income tax return for 1949 which he had prepared and stating that, "[technically] you are also liable for interest on this assessment inasmuch as you filed no Declaration of Estimated Tax for the year 1949." Deutsch also stated that he was not preparing a declaration of estimated tax for 1950, "as I know you will have no funds available with which to make any payment at this time. However, under the law you have until January 15, 1951 in which to file an estimated tax based on your taxable income for the year 1950." He suggested a conference with her toward the end of the year, "as I believe it will be to your advantage and eventually save you much interest if it were possible for you to arrange to meet your income tax obligations on a 'pay as *283 you go' basis." (1) A letter to petitioner dated July 25, 1950, noting that declarations had not been filed for 1948 or 1949, nor so far for 1950. Deutsch noted that "[the] Collector of Internal Revenue has begun to enforce [penalty] provisions very strongly and is making assessments retroactively to 1947." He urged her to set aside funds in order to file and pay either by September 15, 1950 or January 15, 1951. "[Otherwise] a 6% penalty will be assessed. This penalty would be in addition to any interest that may be found due for any tax for the year 1950 remaining unpaid by March 15, 1951." Petitioner fell into arrears on her tax ability in the amount of approximately $75,000. In August 1950, petitioner retained the services of the law firm of Cadwalader, Wickersham & Taft to advise her in regard to her tax problems. Thereafter petitioner filed declarations of estimated tax for 1949 and 1950 showing taxes of $38,986.60 and $45,000.00, respectively. Petitioner paid $10,000 on her 1950 estimated tax and $10,000 on her 1951 estimated tax during 1951 and an additional $2,000 on her 1951 estimated tax in early 1952. She also paid $25,000 on her arrears during 1951. In each *284 of the letters accompanying a payment, petitioner or her counsel requested an extension of time to pay the estimated taxes and the arrears. Each of the letters stated that petitioner's difficulties were due to imprudent advice given to her by her prior tax consultant and that she was endeavoring to become current in her payments. There was no response to these letters from respondent. In October and November 1951, petitioner sought to work out a compromise or agreed payment plan with respondent. On October 18, 1951, petitioner's counsel wrote to Rocco J. Ceroni (hereinafter referred to as Ceroni) of the collector's office, setting forth petitioner's financial situation and again stating that her difficulty was due to erroneous advice "that it was not necessary for her to file declarations of estimated income tax and to put herself on a pay-as-you-go basis." The letter averred that petitioner had been burdened with supporting her daughter, her daughter's child, and her mother; that she had now insisted that another person share her mother's quarters to reduce expenditures; that she had sold her car; that she had unsuccessfully attempted to sublease her apartment; that she had not *285 met with success in efforts to obtain a loan with which to pay her tax indebtedness; and that she had been unable to persuade the settlor of the trust of which she was beneficiary to permit an invasion of the corpus of the trust. On November 14, 1951, petitioner's counsel submitted a financial statement, Form 433, to Ceroni for the period October 15, 1950 to October 15, 1951, showing the following: Receipts
Trust fund
$110,000.00
Miscellaneous
840.00
Disbursements
Debt reduction
5,042.00
Servant's wages
2,080.00
Living expenses, including expenses
of mother, daughter, grand-daugh-
ter, and taxpayer (approximate)
31,000.00
Rent paid
10,637.50
Charitable donations (approximate)
3,000.00
United States and New York income
taxes paid
62,751.07
Doctor and hospital bills, including
outlay for mother and daughter as
well as taxpayer
3,316.05 No action was ever taken on this by the respondent. A partial schedule of petitioner's expenditures during this period, from September 12, 1951 to November 16, 1951, is as follows: Date
Amount
Payee
Remarks
Taxes
Sept. 12
$5,000.00
Collector of Internal Revenue
Estimated
Sept. 12
7,500.00
Collector of Internal Revenue
Arrears
Sept. 14
264.58
State Tax Commission
Income tax
Oct. 11
1,625.26
State Tax Commission
Income tax
Personal
Sept. 26
$300.00
Bergdorf Goodman
On account
Sept. 26
96.00
Regency Club
Dues
Sept. 26
100.00
Henri Bendel, Inc.
On account
Sept. 26
100.00
Elizabeth Arden
On account
Sept. 26
23.64
Peck & Peck
In full
Sept. 26
58.16
Werman & Lester Photo Services
In full
Sept. 26
142.66
French Bootery
In full
Sept. 26
30.75
Cartier, Inc.
In full
Sept. 28
80.00
Traveler's Aid Society
Donation
Oct. 8
32.40
Boating Corporation of Southhampton
Oct. 11
73.96
H. L. Hubbell Mfg.
2 filing cabinets
Oct. 15
150.00
Hospitalized Veterans Music Service
Donation
Oct. 15
53.55
Renee Farca
Stockings
Oct. 16
87.55
Jacque Wilson
Suit
Oct. 16
100.00
Cash
At "21" Club
Oct. 23
30.00
Hospitalized Veterans Music Service
Donation
Oct. 26
54.19
Mormeth & Vickery
Auto insurance
Nov. 1
98.15
Henri Bendel, Inc.
Oct 1st bill
Nov. 1
34.10
Bloomingdale Bros.
In full
Nov. 1
29.05
Jack & Charlie's "21" Club
Sept. charges
Nov. 1
82.56
Madison Avenue & 76th Street Garage
Sept. bill
Nov. 13
20.00
Music Reseach Foundation
Donation
Nov. 16
10.00
Metropolitan Museum of Art
Donation
Nov. 16
132.53
The River Club of New York
Nov. 1st invoice paid in full
Nov. 16
150.22
The Regency Club
Oct. 31 invoice paid in full
Nov. 16
10.00
Cerebral Palsy Society of New York
Donation
Nov. 16
5.00
Father Flanagan's Boys' Town
Donation
*286 Anthony Wolff (hereinafter referred to as Wolff) of the collector's office took over handling petitioner's delinquent account. In the usual procedure of the special warrant squad to which he was assigned, he would see only the taxpayer's delinquent account card and would not see any income tax returns or declarations of estimated tax. Wolff, however, was aware of the Form 433 which petitioner had submitted. In January 1952, petitioner's counsel had a telephone conversation with Wolff in regard to petitioner's delinquent account. He advised Wolff that petitioner had been making payments on both the delinquent account and the current tax but did not have enough funds to pay both accounts in full. On March 5, 1952, petitioner's counsel had another telephone conversation with Wolff, in which Wolff advised that all money that could be made available for taxes should be paid on the arrears. A letter from petitioner's counsel to the collector, dated March 13, 1952, transmitting petitioner's 1951 return and 1952 declaration, contained the following: Your attention is drawn to the fact that no remittance is enclosed herewith. The absence of any remittance is occasioned by the express *287 request made by Mr. Wolff of your Fifth Avenue office, that any checks on account of tax arrears be sent directly to him, and we are sending our client's check in the sum of $10,000 to him for application on the arrears for the 1950 year. With the making of this payment, our client is unable to make any payment at this time in connection with either the 1951 year or the estimated tax for 1952, and we respectfully request an extension of time in which to enable her to make such payment. In that connection, we should like to point out that a complete Form 433 was filed by our client with Mr. Wolff some months back, giving full particulars of her financial situation. A letter from petitioner's counsel, dated March 17, 1952, to Wolff, contained the following: For your information, we might add that we have followed the further suggestion that all moneys available be forwarded to you for application on this oldest tax indebtedness, and our client has as a result not been able to forward any money for further application on the 1951 year's tax or on the declaration for the current year. Thereafter, until 1955, petitioner made payments only on her tax arrears. In correspondence with *288 the collector's or director's office during the years in question, petitioner's counsel noted the procedure being followed and combined therewith requests for extensions of time to pay current as well as delinquent taxes. No formal extension of time to pay either the current or delinquent taxes was ever granted by the collector's or director's office during the years 1951 through 1954, nor was any response made to the request for an extension of time in which to pay. No objection was raised to the procedure being followed by the petitioner. During the period involved here, petitioner supported her mother, who required medical attention, and also contributed to the support of her daughter and her daughter's child who lived with her during part of the period. Petitioner claimed only her mother as an exemption. After her marriage petitioner's income was the chief means of her family's support. Petitioner and Conrad Thibault claimed the latter's son as an exemption. Petitioner engaged in activities pursuant to her career as a writer. She wrote a number of poems and articles. One was sold to Holiday Magazine for $200. She traveled to Europe in 1951 to gather material for a story on *289 Queen Wilhelmina of The Netherlands, whom she had known during World War II, which she hoped to sell to Ladies' Home Journal. It was never accepted for publication. While in Europe she gathered material for articles on the Princess of Liechtenstein, for which she received no substantial return. She began writing a "Celebrity Cook Book" which has not been published. In 1952 and 1953, petitioner and Mrs. Robert Considine attempted to promote a television show called "What's New." There were ten performances of the program, which was a variety show with well-known "intellectuals" from various fields appearing without charge. It attracted some sponsors but was regarded as too intellectual to be successful. Six of the performances were given as charity benefits. The program was abandoned because of the heavy expense involved. Petitioner occasionally worked as an accompanist for her husband who is a professional concert singer. Petitioner, who has also been a professional photographer, attempted to promote several advertising series in association with other persons but was unsuccessful. Petitioner paid the following amounts of Federal income tax: Year
Tax
Payment
1951
Estimated tax for
1950
$10,000.00
Estimated tax for
1951
10,000.00
On balance owing
25,000.00
Total
$45,000.00
1952
Estimated tax for
1951
2,000.00
On balance owing
44,124.19
Total
46,124.19
1953
On balance owing
38,500.00
1954
On balance owing
36,000.00
*290 Petitioner's corrected income tax liability for 1951 and 1952 and petitioner's and Conrad Thibault's corrected joint liability for 1953 and 1954 are as follows: 1951
$39,215.05
1952
36,383.99
1953
37,233.20
1954
42,418.07
A partial schedule of petitioner's other expenditures is as follows: (A) State taxes. Petitioner paid state income taxes of approximately $4,000 annually. (B) Rent. Petitioner paid approximately $500 a month rent during the period involved here on an apartment at 956 Fifth Avenue, New York. This apartment included a two-room suite for petitioner's mother. (C) Servant. Petitioner employed a maid for the apartment during the period at an annual expense of $2,000 to $3,000. (D) Personal secretary. Petitioner employed a personal secretary during at least part of 1951, paying her $50 a week. (E) Business rent. Petitioner rented a two-room business office at 745 Fifth Avenue beginning in 1951 at an annual rate of approximately $3,000. This office was subleased during 1953 and 1954. (F) Entertainment. Petitioner expended amounts for entertainment as follows: Claimed
Total
business
Year
amount
expense
Disallowed
1951
$3,154.85
1952
2,299.73
$ 594.99
$394.99
1953
2,019.62
723.58
250.00
1954
1,926.90
1,314.10
500.00
*291 The disallowances were agreed to by petitioner. (G) Charitable contributions. Amounts claimed by petitioner and disallowed are as follows: Year
Amount
Disallowed
1951
$2,000.00
$180.00
1952
1,901.00
486.00
1953
2,491.60
140.00
1954
2,832.85
182.00
(H) Stock purchases. Petitioner purchased Rainbow Oil stock for $4,600 in June 1951, but the purchase was rescinded 30 days later. Petitioner purchased 2,000 shares of Joe Indian Mountain Metal Mines for $1,210 during 1952 which was subsequently sold at a loss. Petitioner also purchased undisclosed stock through W. E. Hutton Company for $833 during 1952. Petitioner did not consult her tax counsel at Cadwalader, Wickersham & Taft prior to making these investments. (I) Investment in stage plays. Petitioner invested $1,200 in "Four Times Twelve" in the latter part of 1950. The play was unsuccessful and the loss was claimed on her return for 1951. During 1951, petitioner invested $1,200 in "Second Threshold," which was unsuccessful and resulted in a loss of $800. In 1953, petitioner invested $1,470.10 in "Escapade," which was also unsuccessful, and the loss was claimed on her 1953 return. Petitioner did *292 not consult her tax counsel in advance in making these investments. (J) Loans. Petitioner made advances during this period to a non-profit group called "The Dancers," which held dances in her apartment every month. (K) Selected purchases. (1) January 1951: Brooch and earrings for $3,000 from Van Cleef & Arpels, which was subsequently sold. (2) January 1951: Portrait of herself from Uberto Pallastrelli for $1,600. (3) March 1951: A Vickrey painting from Creative Gallery, which was subsequently sold. (4) May 1952: A New De Soto automobile for $2,489.61, which was sold for approximately $1,000 when she married Conrad Thibault. (5) 1953 and 1954: A Steinway piano for $2,700, which was subsequently sold for $2,000. (L) Vacations. (1) February 1951: Two-week trip to Nassau and the Bahamas. (2) June and July 1951: Six-week trip to Europe during which she obtained material to prepare articles on Queen Wilhelmina of The Netherlands and the Princess of Liechtenstein. $1,455 of the $2,200 expense was allowed as a business deduction. (3) January 1952: Two-week trip to Nassau. (4) August 1952: Nine-day stay at Elizabeth Arden's Maine Chance Health Farm in Maine. (5) February *293 1953: Two-week trip to Jamaica, part of which was paid for by a raffle won by petitioner. (6) Summer 1963: $1,500 rent for summer home at Roslyn, Long Island. (7) January 1955: Ten-day vacation in Nassan with her husband and her daughter and daughter's husband. (M) Bills and loans. Petitioner paid bills and loans of undetermined amounts and dates of origination. On her statement of financial condition, Form 443, filed November 14, 1951, petitioner listed her only liability as notes payable in the amount of $4,000. Opinion Petitioner contends that a statement to her counsel by the employee of the internal revenue service who was handling her delinquent tax account constituted "reasonable cause" for her failure to pay current installments of her estimated tax so as to avoid the statutory addition to tax for their nonpayment.[1] The statement was not denied by Wolff, the individual involved, and there was affirmative evidence that it was made. Whether or not it was correct and whether or not Wolff had authority to make it seem to us to be irrelevant to the issue. We regard it as incontrovertible that reliance on his advice was at least as justifiable as in the case of a qualified *294 private tax adviser, which has frequently been held to be "reasonable cause." [2], affirmed per curiam (C.A. 3, 1945); . This is, if anything, a stronger case for petitioner in the light of the fact that a "presumption of legality attaches to the act of a public officer." (C.A. 9, 1949); . *295 Cases holding that estoppel does not lie against the Government, where substantive questions of law, (C.A. 4, 1961), or of fact, , arise, which are the sole objections advanced to petitioner's contention in this respect, are beside the mark. In spite of respondent's mistaken attention to the contrary, these cases did not involve reasonable cause, but only the question of whether the tax in question was legally and actually due. The issue was not, as here, whether there was reasonable cause for failure to make a payment admittedly due, but rather the existence of any liability in the first place. There is no more reason to regard these decisions as authority on reasonable cause than there would be for a taxpayer to argue that he did not owe taxes because a qualified tax consultant advised him that he did not. Cf. ; , another case cited by respondent, is similarly no authority for his position here. There, reliance upon *296 statements of an internal revenue agent as reasonable cause was not rejected but the issue was disposed of by the holding that "before a taxpayer can get relief from the imposition of * * * penalties by showing that his failure to file the original return within the time required by law was due to reasonable cause and not willful neglect, he must file a belated return," (Italics added) which, in that case, had not been done. And in , affirmed per curiam , certiorari denied , decision was for the taxpayer although the situation there was more favorable to respondent. This appears most succinctly in an excerpt from the lone dissent of Judge Disney (p. 679): I think that reasonable cause may not be predicated in the attitude of a revenue agent, at least not where, as here, he merely failed to do anything or say anything * * * To a similar effect is . The statement on which petitioner and her counsel testified that they relied was to the effect that preference was to be given to payment of the taxes, longest in arrears. *297 While petitioner had a large income and spent sizable portions of it for non-tax purposes, we entertain no doubt that in none of the years before us could she have completely discharged both her past due taxes and the payments on her current estimated tax. What she had was virtually an election and a presumably competent authority advised her how to exercise it. This brings us to an issue not originally raised by the parties but on which argument was requested by the Court. Examination of petitioner's use of her funds during the period in controversy indicates the possibility that, notwithstanding the advice upon which she relied, petitioner might have succeeded in applying some amounts to the partial liquidation of her estimated current tax liability; and that hence, while there might have been reasonable cause to some extent, failure to pay anything at all could be attributed to "willful neglect." [3] See . Respondent, however, has taken the position on brief that the addition to tax is indivisible, and that the statute does not contemplate application of the "penalty" to only a part of the underpayment; that, in effect, the entire *298 addition to tax is due or none of it is. Since we find that failure to pay at least a part of the estimated tax was due to reasonable cause and not to willful neglect, and that hence it is not justifiable to impose the entire addition, we conclude that, as the issue is presented here, respondent erred in his determination.
Other grounds relied upon by petitioner as reasonable cause consequently need no further consideration. Decisions will be entered for the petitioners. Footnotes
1. SEC. 294. @ADDITIONS TO, THE TAX IN CASE OF NONPAYMENT. (d) Estimated Tax. - (1) Failure to File Declaration or Pay Installment of Estimated Tax. - * * *
(B) Failure to Pay Installments of Estimated Tax Declared. - * * * [In] the case of a failure to pay an installment of the estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of the unpaid amount of such installment, and in addition 1 per centum of such unpaid amount for each month (except the first) or fraction thereof during which such amount remains unpaid. In no event shall the aggregate addition to the tax under this subparagraph with respect to any installment due but unpaid, exceed 10 per centum of the unpaid portion of such installment. ↩
2. This seems to be respondent's view also. He says in his reply brief: "It is recognized that reasonable reliance upon the advice of qualified tax counsel, to whom full information has been given, is reasonable cause where there are no other factors present."↩
3. See footnote 1, supra. ↩